# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **MCCOMMAS LFG PROCESSING** | § | **Case No. 07-32219-HDH-11** |
| **PARTNERS, LP,** | § | |
| | § | |
| **Debtor.** | § | |
| | | |
| **MCCOMMAS LANDFILL** | § | **Case No. 07-32222-HDH-11** |
| **PARTNERS, LP,** | § | |
| | § | **(Chapter 11; Jointly Administered** |
| **Debtor.** | § | **Under Case No. 07-32219-HDH-11)** |

**FIRST AMENDED DISCLOSURE STATEMENT IN SUPPORT OF THE FIRST AMENDED PLAN OF LIQUIDATION FOR MCCOMMAS LFG PROCESSING PARTNERS, LP AND MCCOMMAS LANDFILL PARTNERS, LP PROPOSED BY THE CHAPTER 11 TRUSTEE**

Bracewell & Giuliani LLP
Samuel M. Stricklin
State Bar No. 19397050
John C. Leininger
State Bar No. 24007544
Bracewell & Giuliani LLP
1445 Ross Ave., Suite 3800
Dallas, Texas 75202
(214) 758-1000 (Telephone)
(214) 758-8343 (Facsimile)

ATTORNEYS FOR CHAPTER 11 TRUSTEE
Dated: October 30, 2007

# I. INTRODUCTION

William K Snyder, Chapter 11 Trustee ("Trustee" or "Plan Proponent"), submits this *First Amended Disclosure Statement in Support of the Plan of Liquidation for McCommas LFG Processing Partners, LP and McCommas Landfill Partners, LP Proposed by the Chapter 11 Trustee* (as may be amended, the "Disclosure Statement"). This First Amended Disclosure Statement is to be used in connection with the solicitation of votes on the *First Amended Plan of Liquidation for McCommas LFG Processing Partners, LP and McCommas Landfill Partners, LP Proposed by the Chapter 11 Trustee,* as may be amended (the "Plan"). A copy of the Plan is attached hereto as Exhibit "A". Unless otherwise defined herein, capitalized terms used herein have the meanings ascribed thereto in the Plan (see Article 1 of the Plan entitled "Definitions and Construction of Terms").

## A.    Notice to Holders of Claims and Interests

The purpose of the Disclosure Statement is to enable creditors of and interest holders in the Debtors whose Claims and Equity Interests are impaired to make an informed decision in exercising their right to vote to accept or reject the Plan.

**THIS DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE PLAN. PLEASE READ THIS DOCUMENT CAREFULLY.**

On _____, 2007, the Bankruptcy Court entered an order pursuant to section 1125 of the Bankruptcy Code (the "Disclosure Statement Order") approving the Disclosure Statement as containing information of a kind, and in sufficient detail, adequate to enable a hypothetical, reasonable investor, typical of the solicited holders of Claims against and Equity Interests in the Debtors, to make an informed judgment with respect to the acceptance or rejection of the Plan. A copy of the Disclosure Statement Order is included in the materials accompanying this Disclosure Statement.

**APPROVAL OF THE DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT DOES NOT CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT REGARDING THE FAIRNESS OR MERITS OF THE PLAN.**

Each holder of an Equity Interest or a Claim entitled to vote to accept or reject the Plan should read this Disclosure Statement and the Plan in their entirety before voting. No solicitation of votes to accept or reject the Plan may be made except pursuant to this Disclosure Statement and section 1125 of the Bankruptcy Code. No entity entitled to vote on the Plan should rely upon any information relating to the Debtors, their businesses, or the Plan other than that contained in the Disclosure Statement and the exhibits hereto. Unless otherwise indicated, the source of all information set forth herein is the Trustee and his professionals.

After carefully reviewing this Disclosure Statement, including the attached exhibits, please indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the enclosed ballot and returning the same to the address set forth on the ballot, in the enclosed return envelope so that it will be received by the Plan Proponent's balloting agent, John C. Leininger, 1445 Ross Avenue, Suite 3800, Dallas, Texas 75202 no later than 4:00 p.m., Central Time, on November 13, 2007.

If you do not vote to accept the Plan, or if you are the holder of an unimpaired Claim, you may be bound by the Plan if the requisite holders of Claims accept it.

**TO BE SURE YOUR BALLOT IS COUNTED, YOUR BALLOT MUST BE RECEIVED NO LATER THAN 4:00 P.M., CENTRAL TIME, ON NOVEMBER 13, 2007.**

Pursuant to section 1128 of the Bankruptcy Code, the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Bankruptcy Court") has scheduled a hearing to consider confirmation of the Plan (the "Confirmation Hearing"), on November 19, 2007, at 9:00 a.m., Central Time, in the Bankruptcy Court. The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be filed and served on or before November 13, 2007 at 4:00 p.m., Central Time, in the manner described under the caption, "Confirmation of the Plan — Confirmation Hearing" set forth below.

## II. EXPLANATION OF CHAPTER 11

### A.      Overview of Chapter 11

Chapter 11 is the principal "reorganization" chapter of the Bankruptcy Code. The commencement of a chapter 11 case creates an estate comprising all the legal and equitable interests of the debtor in property as of the date the petition is filed. Sections 1101, 1107, and 1108 of the Bankruptcy Code provide that a debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession" unless the bankruptcy court orders the appointment of a trustee. In the present chapter 11 cases, a chapter 11 trustee has been appointed for both cases.

The filing of a chapter 11 petition also invokes the automatic stay provisions of the Bankruptcy Code. Section 362 of the Bankruptcy Code provides, *inter alia*, for an automatic stay of all attempts to collect prepetition claims from the debtor or otherwise interfere with its property or business. Except as otherwise ordered by the bankruptcy court, the automatic stay remains in full force and effect until the effective date of a confirmed plan of reorganization.

Maximizing a return and mitigating risk to holders of claims or interests of the company under the rules and protection of the Bankruptcy Code and bankruptcy court are the principal purposes of a chapter 11 case. A plan sets forth the means by which this is achieved. Generally, unless a trustee is appointed, only the debtor may file a plan during the first 120 days of a chapter 11 case. Once a trustee is appointed, any party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder or any indenture trustee may file a plan. A trustee has been appointed in both of

these chapter 11 cases.

## B. Plan of Reorganization

Although referred to as a plan of reorganization, a plan may provide anything from a complex restructuring of a debtor's business and its related obligations to a sale of substantially all of the property of the estate and the distribution of the proceeds of such sale among holders of claims or interests. After a plan of reorganization has been filed, the holders of claims against or interests in a debtor are permitted to vote to accept or reject the plan. Before soliciting acceptances of the proposed plan, section 1125 of the Bankruptcy Code requires the debtor or plan proponent to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan.

This Disclosure Statement is presented by the Plan Proponent to holders of Claims against and Equity Interests in the Debtors to satisfy the requirements of section 1125 of the Bankruptcy Code.

If all classes of claims and equity interests accept a plan of reorganization, the bankruptcy court may nonetheless still not confirm the plan unless the court independently determines that the requirements of section 1129 of the Bankruptcy Code have been satisfied. Section 1129 sets forth the requirements for confirmation of a plan and, among other things, requires that a plan meet the "best interests" test and be "feasible." The "best interests" test (Section 1129(a)(7)) generally requires that the value of the consideration to be distributed to the holders of claims and equity interests under a plan may not be less than those parties would receive if the debtor were liquidated pursuant to a hypothetical liquidation occurring under chapter 7 of the Bankruptcy Code. Under the "feasibility" requirement (Section 1129(a)(11)), the court generally must find that there is a reasonable probability that the debtor will be able to meet its obligations under its plan without the need for further financial reorganization.

The Plan Proponent believes that the Plan satisfies all the applicable requirements of section 1129(a) of the Bankruptcy Code, including, in particular, the "best interests of creditors" test and the "feasibility" requirement. The Plan Proponent urges all holders of impaired Claims to accept the Plan.

Chapter 11 does not require that each holder of a claim against or interest in a debtor vote in favor of a plan of reorganization in order for the bankruptcy court to confirm the plan. At a minimum, however, the plan must be accepted by a majority in number and two-thirds in amount of those claims actually voting in at least one class of impaired claims under the plan, without including any acceptance of the plan by an insider. The Bankruptcy Code also defines acceptance of the plan by a class of equity interests (equity securities) as acceptance by holders of two-thirds of the number of shares actually voting. In the present cases, only the holders of Claims and Equity Interests who actually vote will be counted as either accepting or rejecting the Plan.

In addition, classes of claims or equity interests that are not "impaired" under a plan of reorganization are conclusively presumed to have accepted the plan and thus are not entitled to

vote. Accordingly, acceptances of a plan will generally be solicited only from those persons who hold claims or equity interests in an impaired class. A class is "impaired" if the legal, equitable, or contractual rights attaching to the claims or equity interests of that class are modified in any way under the plan. Modification for purposes of determining impairment, however, does not include curing defaults and reinstating maturity or payment in full in cash.

The bankruptcy court may also confirm a plan of reorganization even though fewer than all the classes of impaired claims and interests accept it. For a plan of reorganization to be confirmed despite its rejection by a class of impaired claims or interests, the proponent of the plan must show, among other things, that the plan does not "discriminate unfairly" and that the plan is "fair and equitable" with respect to each impaired class of claims or interests that has not accepted the plan.

Under section 1129(b) of the Bankruptcy Code, a plan is "fair and equitable" as to a class of rejecting claims if, among other things, the plan provides: (a) with respect to secured claims, that each such holder will receive or retain on account of its claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim; (b) with respect to unsecured claims, that the holder of any claim (i) will receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim or (ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain on account of such junior claim or interest any property; and (c) with respect to equity interests, that the holder of such interest (i) will receive or retain on account of such interest property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed redemption price to which such holder is entitled, or the value of such interest; or (ii) the holder of any interest that is junior to the interests of such class will not receive or retain under the plan any property on account of such interest.

A plan does not "discriminate unfairly" against a rejecting class of Claims if the relative value of the recovery of such class under the plan does not differ materially from that of any class (or classes) of similarly situated Claims or Equity Interests.

The Plan Proponent believes that the Plan has been structured so that it will satisfy these requirements as to any rejecting Class of Claims or Equity Interests, and can therefore be confirmed, if necessary, over the objection of any Classes of Claims or Equity Interests.

### III. HISTORY OF THE DEBTOR AND SIGNIFICANT EVENTS IN THE BANKRUPTCY CASES

#### A. Information Previously Disclosed by the Debtors or Trustee

Certain of the information set forth below has been provided by the Debtors, the Managing Partner of the Debtors and other external sources. The Trustee used a combination of the information provided by these sources together with his own analysis regarding the impact of the Plan upon the rights and liabilities of the Debtors and all creditors of the estates. While the Trustee has attempted to provide information from sources believed to be reliable, the Trustee has not independently verified the accuracy of all of the information.

## B. Overview

McCommas Processing is a limited partnership formed under the laws of the State of Texas on June 9, 2003. McCommas Landfill is a limited partnership formed under the laws of the State of Texas on February 26, 2003.

McCommas Processing and McCommas Landfill were formed to purchase the assets of Dallas Landfill Gas Production, L.L.C. ("DLGP") and Ecogas McCommas Bluff, Inc. ("EMBI") in their previously filed bankruptcy proceedings styled *In re Dallas Landfill Gas Production, L.L.C.; Ecogas McCommas Bluff, Inc.,* Case Nos. 03-32037 and 03-32039, respectively, in the United States Bankruptcy Court for the Northern District of Texas. Originally, DLGP was engaged in the business of collecting and selling landfill gas from the McCommas Bluff Landfill Facility located in Dallas, Texas. DLGP obtained rights to collect the landfill gas through the City Lease. In December of 1997, DLGP subleased a portion of the premises it held under the City Lease to EMBI. Thereafter, EMBI constructed a facility for processing and treating landfill gas (the "Processing Facility"). Construction of the Processing Facility was funded through an assignment and lease back transaction with the Bell County Industrial Development Corporation ("Bell County"), wherein EMBI assigned certain of its rights to Bell County in return for Bell County's issuance of $11,500,000 in tax free bonds. The proceeds of the Bonds were used to construct the facility. Thereafter, the Processing Facility was leased by Bell County to EMBI.

As the successful bidder at the sale pursuant to Sections 363 and 365 of the Bankruptcy Code, McCommas Processing and McCommas Landfill acquired the assets of DLGP and EMBI, including but not limited to, rights under the City Lease and Bell County Lease. In addition, McCommas Processing now owns a substantial portion of the Bonds, aggregating $9.2 million of the face amount of the Bonds.

Initially, McCommas Processing and McCommas Landfill were each owned 1% by their general partner, McCommas Landfill Management LLC, 49.5% by Bluff Power Partners, LP ("Bluff Power") as a limited partner, and 49.5% by NGP Power Corp. as a limited partner.

McCommas Processing is currently owed 1% by McCommas LFG Processing Management, LLC as the general partner, 50% by Bluff Power, as a limited partner, and 49% by ES Energy Solutions, LP, as a limited partner. McCommas Landfill is currently owned 1% by McCommas Landfill Management, LLC as the general partner, 45% by Bluff Power, as a limited partner, 44% by ES Energy Solutions, LP, as a limited partner, 5% by G. Larry Wallace, as a limited partner, and 5% by Wallace L. Hall, Sr., as a limited partner.

Together, the Debtors collect methane gas created by the organic decay of landfill materials at the McCommas Bluff Landfill. Once collected, the gas is processed onsite to create pipeline quality natural gas. Thereafter, the pipeline quality gas is sold either at spot market prices or under contracts. As with their predecessors, the Debtors' rights to collect the methane gas derive from the City Lease. Likewise, the Debtors' rights to utilize the Processing Facility derive from the Bell County Lease.

## C. Events Leading to Chapter 11 Filings

Prior to the Petition Date, the general partner of the Debtors met with Bluff Power regarding a potential sale of substantially all of the Debtors' assets to Pratt Industries (U.S.A.) ("Pratt"). As a limited partner in both of the Debtors, Bluff Power's consent to such a transaction was required. After reviewing the proposal, Bluff Power informed the Debtors' general partner that it had a number of questions with respect to the proposed transaction. Subsequently, Bluff Power informed the Debtors' general partner that it would not consent to the proposed transaction. Within hours thereafter, the general partner caused both of the Debtors to file for bankruptcy.

### D. Significant Events Since Commencement of the Chapter 11 Cases

#### 1. Establishment of the Trustee Protocol and Appointment of the Trustee

On May 14, 2007, the Bankruptcy Court entered an Order authorizing the United States Trustee to appoint a single chapter 11 Trustee for each of the Debtors' bankruptcy estates. This order also set forth a protocol, agreed to by and among the Debtors' general partner and Bluff Power (the "Trustee Protocol"), for the person selected as trustee to follow after his or her appointment. On May 21, 2007, the Bankruptcy Court entered an Order approving the appointment of the Trustee. Since then the Trustee has continued to operate the Debtors' businesses and sought potential purchasers for substantially all of the Debtors' assets pursuant to the Trustee Protocol.

#### 2. Stay of Litigation

An immediate effect of the filing of a bankruptcy case is the imposition of the automatic stay under the Bankruptcy Code, which, with limited exceptions, enjoins the commencement or continuation of all litigation against the Debtors. This injunction will remain in effect until the Effective Date unless otherwise modified by the order of the Bankruptcy Court.

#### 3. Use of Cash Collateral

On or about May 25, 2007, the Trustee filed a Motion for Interim and Final Use of Cash Collateral. On May 31, 2007, the Bankruptcy Court entered its Interim Order Authorizing the Trustee to Use Cash Collateral. On June 12, 2007, the Bankruptcy Court entered its Final Order Authorizing the Trustee to Use Cash Collateral.

#### 4. Negotiations for the Sale Of Substantially All of the Debtors' Assets

After his appointment, the Trustee set up a virtual due diligence website for parties interested in gathering information about the Debtors' assets. Next the Trustee contacted several parties that he thought would have an interest in the Debtors' assets. Additionally, parties with an interest in the Debtors' assets contacted the Trustee. After negotiating the terms of an asset sale with multiple interested bidders, the Trustee executed, subject to Bankruptcy Court approval, an Asset Purchase Agreement (the "APA") with Camco International, Inc. ("Camco"), which provides for the sale of substantially all of the Debtors' assets, free and clear of all liens, claims, encumbrances and interests to Camco for a purchase price of $11,250,000, and the assumption by Camco of certain executory contracts and unexpired leases.

### 5. Extension of Deadline to Assume Unexpired Leases

On September 3, 2007, the Bankruptcy Court entered an order extending the Trustee's deadline to seek assumption and assignment of the City Lease and the Bell County Lease as well as a sublease between the Debtors to December 2, 2007.

### 6. Motion to Estimate Claim of MMR Group, Inc., et al.

On August 20, 2007, the Trustee filed a Motion for Order Pursuant to 11 U.S.C. § 502(c) Estimating Certain Contingent or Unliquidated Claims for Purposes of Voting, Allowance and Distribution (the "Estimation Motion"). The Estimation Motion seeks an order from the Court establishing the value, if any, of the Claim asserted against the Debtors by MMR Group, Inc., et al. Pursuant to a Stipulation between the Trustee and MMR Group, Inc. et al., the Estimation Motion has been removed from the Bankruptcy Court's schedule subject to either party asking the Bankruptcy Court to set the matter for hearing. On October 11, 2007, the Trustee filed an Objection to the Claim of MMR.

## IV. SUMMARY OF THE PLAN

**THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE OF THE PLAN AND OF THE CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN. IT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, WHICH IS ANNEXED TO THIS DISCLOSURE STATEMENT AS EXHIBIT A.**

**THE SUMMARIES OF THE PLAN AND OF OTHER DOCUMENTS REFERRED TO HEREIN DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THOSE DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF THEIR TERMS AND PROVISIONS.**

**THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN CONTROL THE ACTUAL TREATMENT OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS AND WILL, UPON THE EFFECTIVE DATE, BE BINDING UPON ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTOR AND OTHER PARTIES IN INTEREST. IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN OR ANY OTHER OPERATIVE DOCUMENTS, THE TERMS OF THE PLAN OR THE OTHER OPERATIVE DOCUMENTS WILL CONTROL.**

### A. General Overview

The structure of the Plan is based upon payment in full of Allowed Claims and a return to Equity Interest holders. A summary of the anticipated disposition of the Sales Proceeds is set forth in Exhibit B.

The Trustee anticipates that the estate will receive a minimum of $11,250,000 from the sale of the Debtors' assets. The Trustee believes that the vast majority of the Sales Proceeds are attributable to the assets of the McCommas Processing estate. The assets of the McCommas

Processing estate include among other things the sublease of the City Lease, which the Trustee believes is the most valuable asset of the Debtors' estates. This sublease was assigned to Bell County Industrial Development Corporation and has been pledged as collateral to the Indenture Trustee.

From the Sales Proceeds the Trustee shall pay the Allowed Secured Claim of the Dallas County Appraisal District which is estimated at $35,559. The Trustee believes that the Dallas County Appraisal District has a valid, first-priority lien against the McCommas Processing assets.

From the Sales Proceeds remaining after payment of the Dallas County Appraisal District's claim, the Trustee will pay the Allowed Secured Claim of the Indenture Trustee, in two payments. The first payment, the Wire Bond Payment, in the approximate amount of $1,672,752 will go to pay the Minority Bonds the full value of all outstanding principal and interest due on the Minority Bonds, plus certain additional fees related to the Bonds including, but not limited to, reasonable attorneys fees.

The second payment to the Indenture Trustee, the Check Bond Payment, in the amount of $9,541,689 will go to the Indenture Trustee and be returned to the Trustee on behalf of the Debtors' estates in satisfaction of the Debtor Owned Bonds. To the extent the Check Bond Payment is insufficient to satisfy the Debtor Owned Bonds, the Debtor Owned Bonds will be cancelled.

The Debtor Bond Proceeds will be used by the Liquidating Trustee to satisfy the remaining Allowed Claims and Equity Interests.

Based on the anticipated Sales Proceeds, the Trustee does not believe there is sufficient value in the Debtors' assets to secure the Asserted Secured Claims of SCS and MMR. To the extent the Sales Proceeds exceed the Allowed Secured Claims of the Dallas County Appraisal District and the Indenture Trustee the proceeds will first be paid to the Allowed Secured Claims of SCS, MMR and Other Secured Claims according to their relative priorities to the remaining Sales Proceeds under applicable law.

Currently, the Trustee estimates a payment of $0 to SCS, MMR and other Secured Creditors on account of their asserted secured claims. After payment of all Allowed Secured Claims, the Trustee will use the Debtor Bond Proceeds to pay the Allowed Administrative Claims as follows:

| | |
|---|---|
| SCS claim related to payment for post-petition Plant Failures | $87,896 |
| Estimated Professional Fees: | |
| Bracewell & Giuliani LP | $900,000 |
| CRG Partners Group, LLC | $100,000 |
| Chapter 11 Trustee | $337,500 |
| United States Trustee Fees | $ 10,000 |

Thereafter, the Trustee will use the remaining Debtor Bond Proceeds to pay the Allowed General Unsecured Claims which the Trustee estimates at $2,313,005, assuming the unsecured claims of Bluff Power and MMR are disallowed. This amount includes payment of the SCS claim and the Weldon Contractor claim. For a discussion of the Bluff Power and MMR claims please refer to Article IV.A. herein. To the extent Allowed General Unsecured Claims exceed the amount of money remaining in the Trust, each Holder of an Allowed Class 6A or 6B claim shall receive its pro-rata share of the remaining funds.

Any Debtor Bond Proceeds remaining after payment of all Allowed Claims against the Debtors, in full, shall remain in the Trust pending resolution of the Litigation Claims and thereafter shall be distributed pursuant to the Partnership Agreements.

## B.     Classification Overview

Section 1123 of the Bankruptcy Code provides that a plan of reorganization must classify the claims of a debtor's creditors and the claims of its interest holders. In accordance with section 1123, the Plan divides Claims and Interests into Classes and sets forth the treatment for each Class (other than Administrative Claims and Priority Tax Claims). The Debtor is required, under section 1122 of the Bankruptcy Code, to classify Claims against and Interests in the Debtors into Classes which contain Claims and Interest that are substantially similar to the other Claims and Interests in such Class.

The Trustee believes that the Plan has classified Claims and Equity Interests in compliance with the provisions of section 1122; however, it is possible that a holder of a Claim or Equity Interest may challenge the Trustee's classifications of Claims and Equity Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed. In that event, the Trustee intends, to the extent permitted by the Bankruptcy Code, the Plan and the Bankruptcy Court to make modifications to the classifications under the Plan to permit confirmation and to use the Plan acceptances received in this Solicitation for purposes of obtaining the approval of the reconstituted Class or Classes of which each accepting holder ultimately is deemed to be a member. Any such reclassification could adversely affect the Class in which such holder initially was a member, or any other Class under the Plan, by changing the composition of such Class and the vote required of that Class for approval of the Plan. Furthermore, a reclassification of a Claim or Equity Interest after approval of the Plan could necessitate a re-solicitation of the Plan.

## C.     Unclassified Claims

Unclassified Claims against the Debtors consist of Administrative Claims, Priority Tax Claims and U.S. Trustee Fees in accordance with section 1123(a)(1) of the Bankruptcy Code. Based on the Debtors' books and records and the Trustee's projections for future expenses, the Plan Proponent presently estimates that the amount of such Claims should not exceed $1,347,500.

The holder of any Administrative Claim, other than (i) a Fee Claim, (ii) a liability incurred and paid in the ordinary course of business by the Debtors' Estates, or (iii) an Allowed Administrative Claim, must file with the Bankruptcy Court, and serve on the parties directed by

the court notice of such Administrative Claim prior to the Administrative Claims Bar Date. Such notice must include at a minimum (i) the name of the holder of the Claim, (ii) the amount of the Claim, and (iii) the basis of the Claim (including applicable documentation). The holder of any Administrative Claim that is incurred on or after the Administrative Claims Bar Date, other than (i) a Fee Claim, (ii) a liability incurred and paid in the ordinary course of business by the Debtors' Estates, or (iii) an Allowed Administrative Claim, must file with the Bankruptcy Court, and serve on the Trustee, the Plan Proponent, and their respective counsel, notice of such Administrative Claim on or before the thirtieth (30th) day after the Confirmation Date. Such notice must include at a minimum (i) the name of the holder of the Claim, (ii) the amount of the Claim, and (iii) the basis of the Claim (including applicable documentation). Failure to file timely and properly serve the notice shall result in the Administrative Claim being forever barred and discharged.

Each Professional who holds, or asserts, an Administrative Claim that is a Fee Claim for compensation for services rendered and reimbursement of expenses incurred prior to the Effective Date shall be required to file with the Bankruptcy Court and serve on all parties required to receive such notice, a Fee Application within forty-five (60) days of the Effective Date. Failure to file timely a Fee Application shall result in the Fee Claim being forever barred and discharged.

An Administrative Claim with respect to which notice has been properly filed pursuant to shall become an Allowed Administrative Claim if no objection is filed within thirty (30) days after its filing and service. If an objection is filed within such thirty (30) day period, the Administrative Claim shall become an Allowed Administrative Claim only to the extent Allowed by Final Order. An Administrative Claim that is a Fee Claim, and with respect to which a Fee Application has been properly filed, shall become an Allowed Administrative Claim only to the extent allowed by Final Order.

Each holder of an Allowed Administrative Claim shall be paid the amount of such holder's Allowed Administrative Claim in Cash on or before the Initial Distribution Date, or shall receive such other treatment as agreed upon in writing by the Liquidating Trustee and such holder; *provided, however,* that an Administrative Claim representing a liability incurred in the ordinary course of business by the Trustee may be paid in the ordinary course of business by the Trustee. All Allowed Fee Claims shall be paid by the Liquidating Trustee within ten (10) days after such Claim is Allowed by Final Order.

Each holder of an Allowed Priority Tax Claim shall receive the full amount of such holder's Allowed Claim in one Cash payment on or before the Initial Distribution Date. Based on the Debtors' books and records the Trustee presently estimates that the amount of such Claims is $0.

The Liquidating Trustee shall be responsible for timely payment of United States Trustee quarterly fees incurred pursuant to 28 U.S.C. §1930(a)(6). Any fees due The United States Trustee as of the date of confirmation of the Plan will be paid in full on the Effective Date. After confirmation, the Liquidating Trustee shall pay United States Trustee quarterly fees as they accrue until these cases are closed by the Court.

### D. Classification and Treatment of Claims and Equity Interests

All Claims (other than Administrative Claims, Fee Claims, Priority Tax Claims and U.S. Trustee Fees) and Equity Interests are classified for all purposes, including voting, confirmation and distribution pursuant to the Plan as follows:

| Class | Status | Treatment |
|---|---|---|
| Class 1A: Non-Tax Priority Claims – McCommas Processing<br><br>Class 1B: Non-Tax Priority Claims – McCommas Landfill | Unimpaired | Each Holder of an Allowed Non-Tax Priority Claim shall receive (i) the amount of such holder's Allowed Claim in one Cash payment on or as soon as practicable after the Initial Distribution date or (ii) such other treatment as may be agreed upon in writing between either the Trustee or the Liquidating Trustee and the holder of such Claim. |
| Class 2A: Secured Claim of Dallas County Appraisal District – McCommas Processing<br><br>Class 2B: Secured Claim of Dallas County Appraisal District – McCommas Landfill | Impaired | The Allowed Class 2A and 2B Claims of the Dallas County Appraisal District shall be paid in full from the Sales Proceeds. The Trustee estimates Class 2A and 2B Claims to be in the approximate amount of $35,559.00 |
| Class 3A: Secured Claim of the Indenture Trustee – McCommas Processing<br><br>Class 3B: Secured Claim of the Indenture Trustee – McCommas Landfill | Unimpaired | The Allowed Secured Claim of the Indenture Trustee shall be paid in full in the manner described in the Plan. |
| Class 4A: SCS Secured Claims – McCommas Processing<br><br>Class 4B: SCS Secured Claims – McCommas Landfill | Impaired | The Allowed Secured Claim of SCS shall be paid from the SCS Collateral Proceeds. To the extent the Allowed Secured Claim of SCS exceeds the amount of the SCS Collateral Proceeds, the balance will be treated as a general unsecured claim in Classes 6A and 6B. |
| Class 5A: MMR Secured Claims – McCommas Processing<br><br>Class 5B: MMR Secured Claims – McCommas Landfill | Impaired | The Allowed Secured Claim of MMR shall be paid from the MMR Collateral Proceeds. To the extent the Allowed Secured Claim of MMR exceeds the amount of the MMR Collateral |

| | | |
|---|---|---|
| | | Proceeds, the balance will be treated as a general unsecured claim in Classes 6A and 6B. |
| Class 5C: Other Secured Claims – McCommas Processing<br><br>Class 5D: Other Secured Claims – McCommas Landfill | | Classes 5C and 5D shall include all Other Secured Claims against McCommas Processing and McCommas Landfill. Unless otherwise agreed to by the holder of any Other Secured Claim and the Trustee, on the Effective Date or the Closing Date, whichever is later, the holder of an Allowed Other Secured Claim shall receive the Other Collateral Proceeds attributable to its Secured Claim up to the full amount of its Allowed Secured Claim. Any deficiency Claim related to the Allowed Other Secured Claims shall be treated as a General Unsecured Claim. |
| Class 6A: General Unsecured Claims – McCommas Processing<br><br>Class 6B: General Unsecured Claims -- McCommas Landfill | Impaired | All holders of Allowed Class 6A and 6B Claims shall receive Cash payments equal to their pro-rata share of funds available after payment of the Allowed MMR, SCS and Other Secured Claims.<br><br>The Trustee believes all Allowed Class 6A and 6B Claims will be paid in full. |
| Class 7A: Equitably Subordinated Claims – McCommas Processing<br><br>Class 7B: Equitably Subordinated Claims – McCommas Landfill | Impaired | All holders of Allowed Class 7A and 7B Claims shall receive Cash payments equal to their pro-rata share of funds available after payment of the Allowed MMR, SCS and Other Secured Claims, and Allowed Class 6A and 6B Claims. |
| Class 8A: Equity Interests – McCommas Processing<br><br>Class 8B: Equity Interests – McCommas Landfill | Impaired | Equity Interest Holders shall retain their existing interest in the Debtors and the existing Partnership Agreements shall remain in place, unchanged, except such Partnership Agreements shall be subject to the terms and provisions of the Plan. The Equity Holders, including the general partner of the Debtors, shall have no authority to administer or control any assets of the Debtors, unless and until abandoned by the Liquidating Trustee following notice and a hearing. Upon payment in full of all Administrative, |

| | | Priority, Secured and Unsecured Claims, and all costs of administration of the Trust the Residual Funds shall be held in the Trust pending (a) resolution of the Litigation Claims, (b) a written agreed order amount the Partners regarding how such funds shall be distributed, or (c) pursuant to the McCommas Processing Partnership Agreement and the McCommas Landfill Partnership Agreement an arbitration award being filed with the Bankruptcy Court setting forth the judgment in arbitration regarding how such funds shall be distributed. Nothing herein shall effect a release of the partners of the Debtors of the claims that may exist against them by the Debtors or each other. |
|---|---|---|

### E. Releases

As provided for in the Plan, the Debtors shall release the Trustee, his attorneys and advisors from any and all claims that may arise with respect to the Debtors' bankruptcy cases.

### F. Objections to Claims

From and after the Effective Date, the Liquidating Trustee will have the authority to file, settle, compromise, withdraw, arbitrate, or litigate to judgment additional objections to claims pursuant to applicable provisions of the Bankruptcy Code, the Bankruptcy Rules and the Plan.

Any objection to the allowance of a Claim shall be in writing and may be filed with the Bankruptcy Court not later than 3 months after the Effective Date. The failure of the Trustee or any other party in interest to object to any claim for voting purposes will not be deemed a waiver of the Liquidating Trustee's right to object to, or re-examine, any such Claim in whole or in part.

On October 11, 2007, the Trustee filed an objection to the Claim filed by MMR, asking that the MMR Claim be disallowed. No hearing has been set on this Objection. Prior to the Confirmation Hearing, the Trustee will file an objections to the Claim filed by Bluff Power Partners. The Trustee does not believe that Bluff Power holds valid Claims against the Debtors.

On September 18, 2007 MMR filed a proof of claim against each of the Debtors in an amount exceeding $13.3 million. On October 11, 2007, the Trustee filed an objection to the proofs of claim filed by MMR. The Trustee's objection seeks disallowance of MMR's claims based on the Trustee's belief that no contract exists between the Debtors and MMR. To the extent the Court determines there is a contract between the Debtors and MMR, the Trustee has

asked the Court reduce MMR's claims due to MMR's failure to mitigate its claims, and because the claim is inflated by costs MMR did not incur.

The Trustee believes the Bankruptcy Court should disallow MMR's claim. However to the extent the Court does not disallow MMR's claim the Trustee believes the maximum value of MMR's claim is $1.3 million.

On September 19, 2007, Bluff Power filed a proof of claim against each of the Debtors in the amount of $6 million plus an unliquidated amount estimated at $100 million. The Trustee believes that pursuant to Texas law the claims asserted by Bluff Power are either derivative and belong to the Debtors, or are claims against non-debtor entities. Therefore, the Trustee believes Bluff Power's unsecured claims should be disallowed. To the extent Bluff Power's unsecured claims are allowed, they will be treated in Classes 6A and 6B under the Plan.

### G.    Conditions to Effective Date

The Plan shall not become effective unless and until the Effective Date occurs. The occurrence of the Effective Date of the Plan is subject to the following conditions precedent:

      **1.**    The Bankruptcy Court shall have entered the Confirmation Order, in form and substance acceptable to the Trustee; and

      **2.**    all actions, documents, and agreements necessary to implement the Plan shall have been effected or executed.

### H.    Deadline for Effectiveness of the Plan

If all the conditions to the effectiveness of the Plan have not been satisfied or waived by December 31, 2007, the Plan shall be deemed terminated and the Confirmation Order shall be deemed vacated. The deadline for effectiveness of the Plan can be extended, modified, or waived only by the Trustee. On or prior to December 31, 2007, the Trustee shall file a notice with the Bankruptcy Court stating that all conditions to effectiveness of the Plan have either been satisfied or waived and setting forth the Effective Date, or not been satisfied and there is no Effective Date.

### I.    Exculpation, Injunction and Term of Injunctions and Automatic Stay

The Trustee shall neither have nor incur any liability whatsoever to any person or entity for any act taken or omitted in good faith in connection with or related to the formulation, preparation, dissemination, implementation, confirmation, or consummation of the Plan, this Disclosure Statement, any Plan Document, the APA, or any contract, instrument, release or other agreement or document created or entered into, or any other act taken or omitted, in connection with the Plan or these Cases; provided, however, that this exculpation from liability provision shall not be applicable to any liability found by a court of competent jurisdiction to have resulted from fraud or the willful misconduct or gross negligence of any such party. These rights granted are cumulative with (and not restrictive of) any and all rights, remedies, and benefits that the Trustee has or obtains pursuant to any provision of the Bankruptcy Code or other applicable law.

**J.      Retention and Enforcement of Third Party Claims**

Pursuant to section 1123(b)(3) of the Bankruptcy Code, except as otherwise provided in the Plan or Confirmation Order, after the Confirmation Date, the Liquidating Trustee will have the exclusive right to pursue any and all Litigation Claims against any person or entity and rights of the Debtors that arose before or after the Petition Date, including but not limited to all avoidance powers granted to the Trustee under the Bankruptcy Code.

## V.  ACCEPTANCE OR REJECTION OF THE PLAN

**A.      Class Acceptance Requirement**

Under the Bankruptcy Code, only Classes of Claims and Interests that are "Impaired" (as that term is defined in section 1124 of the Bankruptcy Code) under the Plan are entitled to vote to accept or reject the Plan.   A Class is Impaired if the Plan modifies the legal, equitable or contractual rights of holders of Claims or Interests in the Class (other than by curing defaults and reinstating debt.)  Under section 1126(f) of the Bankruptcy Code, Classes of Claims and Interests that are unimpaired are conclusively presumed to have accepted the Plan and are not entitled to vote on the Plan.  Under section 1126(g) of the Bankruptcy Code, Classes of Clams and Interests whose holders will not receive or retain any property under the Plan are deemed to have rejected the Plan and are not entitled to vote on the Plan.

An Impaired Class of Claims shall have accepted the Plan if (i) the holders of at least two-thirds in amount of the Allowed Claims actually voting in the Class have voted to accept the Plan and (ii) holders of more than one-half in number of the Allowed Claims voting in the Class have voted to accept the Plan, in each case not counting the vote of any holder designated under section 1126(e) of the Bankruptcy Code.

An Impaired Class of Equity Interests shall have accepted the Plan if the holders of at least two-thirds in amount of Allowed Equity Interests actually voting the Class have voted to accept the Plan, in each case not counting the vote of any holder designated under section 1126(e) of the Bankruptcy Code.

Classes 2A, 2B, 4A, 4B, 5A, 5B, 5C, 5D, 6A, 6B, 7A, 7B, 8A and 8B are Impaired under the Plan.  Accordingly the holders of Claims in 2A, 2B, 4A, 4B, 5A, 5B, 5C, 5D, 6A, 6B, 7A, 7B and Equity Interests in Classes 8A and 8B are entitled to vote on the Plan.  Classes 1A, 1B, 3A and 3B are unimpaired and not entitled to vote on the Plan.

**B.      Cramdown**

The Trustee may request confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code, and he reserves the right to modify the Plan to the extent, if any, that confirmation in accordance with section 1129(b) of the Bankruptcy Code requires modification.  Under section 1129(b) of the Bankruptcy Code, the Court may confirm a plan over the objection of a rejecting class, if among other things, (a) at least one impaired Class of Claims has accepted the plan (not counting votes of any "insiders" as defined by the Bankruptcy Code) and (b) the plan "does not discriminate unfairly" against and is "fair

and equitable" to each rejecting class. To the extent all Impaired Class do not vote to accept the Plan, the Trustee will seek confirmation pursuant to section 1129(b) of the Bankruptcy Code.

## VI. MEANS FOR IMPLEMENTATION OF THE PLAN

### A. Sale of Substantially All Assets of the Debtors

The implementation of the Plan requires consummation of the Transactions contemplated by the APA, which is incorporated by reference herein. To the extent not sold prior to the Confirmation Date, the Plan shall constitute a motion under sections 363(b), (f) and 1125(a)(5)(B) of the Bankruptcy Code, to sell substantially all of the Debtors' assets, free and clear of all liens, claims and encumbrances, to the Highest Bidder at the Auction.

The Trustee has recently negotiated and executed, subject to Bankruptcy Court approval, the APA with Camco, which provides for the sale of substantially all of the Debtors' assets, free and clear of all liens, claims, and encumbrances, to Camco for a purchase price of $11,250,000.

Exhibit B is a summary of the anticipated disposition of the sales proceeds. The summary reflects an anticipated minimum of $11,250,000 of Sales Proceeds will be available for the payment of Allowed Claims.

The Sale is expected to close no later than November 21, 2007.

### B. Creation of the Trust to Administer Sales Proceeds

A major component to the implementation of the Plan, and a measure designed to further protect the interests of all Creditors of these estates, is the creation through the Confirmation Order of the Trust to hold the sales proceeds, make sufficient reserves for disputed Claims, make timely and appropriate distributions to allowed Claims, to hold and manage all Litigation Claims, and otherwise carry out the provisions of the Plan.

The Liquidating Trustee's services shall include, but not be limited to, the following:

1.      receiving the Sale Proceeds from the sale of the Debtors' assets and maintaining these funds in a McCommas Trust Disbursement Account set up by the Liquidating Trustee, and naming the Liquidating Trustee as the sole signatory;

2.      reviewing all claims and interests asserted against, or scheduled by the Debtors, and to the extent necessary bringing and pursuing objections to such claims or interests;

3.      making timely payment of Allowed Claims and any other payments, as required under the Plan;

4.      investigating, resolving and/or to the extent warranted pursuing all Litigation Claims;

5.      taking any such other actions as are necessary to carry out the intent of the Trust.

A copy of the Trust Agreement will be made available to Bluff Power, MMR, and other parties requesting a copy seven (7) days prior to the Confirmation Hearing.

## VII.  TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A.      Assumption of the City Lease

Under the APA, Camco has designated that the Debtors assume and assign to Camco the City Lease.  The Debtors' estates are obligated to pay any cure cost for any contract or lease to be assumed and assigned.  The Trustee does not expect Camco to request assumption and assignment of any other contract or lease.

Except as provided in the Plan, and to the extent not previously accomplished pursuant to an order of the Court, or in any contract, instrument, release or other agreement or document entered into in connection with the Plan, as of the Effective Date, the Debtors shall be deemed to have assumed and assigned the City Lease to Camco.  Nonetheless, the Trustee shall file a Sale Motion and a Lease Assumption and Assignment no later than 10 (ten) business days before the Confirmation Hearing.

The City asserts that the cure claims associated with assumption of the City Lease total $275,207.  The Trustee disputes whether the City is entitled to such claims under the City Lease and believes the Debtors' estates are entitled to offsets related to damages caused to the Debtors' property as a result of the City and/or its employees.

Except as provided in the Plan, and to the extent not previously paid pursuant to an order of the Court, any monetary amounts by which the City Lease is in default, shall be satisfied, under section 365(b)(1) of the bankruptcy Code by cure payments which will be made out of the Sales Proceeds on the Initial Distribution Date.

### B.      Rejection and Termination of the Bell County Lease

Under the APA, the Trustee will seek rejection and termination of the Bell County Lease pursuant to Section 11.1 thereof.

Except as provided in the Plan, and to the extent not previously accomplished pursuant to an order of the Court, or in any contract, instrument, release or other agreement or document entered into in connection with the Plan, as of the Effective Date, the Debtors shall be deemed to have rejected the Bell County Lease, and the Bell County Lease shall be deemed terminated.

After the termination of the Bell County Lease, the Trustee on behalf of the Debtors shall exercise the Debtors' option in Section 11.1 of the Bell County Lease to purchase the processing facility for its fair market value. The purchase price shall be paid out of the Sale Proceeds on the earlier of the Closing Date or the Effective Date.

### C.     Other Executory Contracts and Unexpired Leases

Except as otherwise provided in the Plan, the APA, or in any contract, instrument, release or other agreement or document entered into in connection with the Plan, as of the Effective Date, the Debtors shall be deemed to have rejected all other executory contracts and unexpired leases which are not designated for assumption by the Highest Bidder. The Confirmation Order shall constitute an order of the Bankruptcy Court under section 365 of the Bankruptcy Code approving the rejection as of the Effective Date.

### D.     Litigation

#### 1.     MMR Litigation

A lawsuit was originally brought by the Debtors against MMR Group, Inc., MMR Power Solutions, LLC and MMR Constructors, Inc. and others in the 68th Judicial District Court of Dallas County, Texas, Cause No. 06-03452. The nature of the proceeding has been described in the Debtors' Schedules as a "Declaratory action and counterclaim regarding payment of $13 million." On August 3, 2007, the MMR lawsuit was removed to the Bankruptcy Court by the Trustee. On August 20, 2007, the Trustee filed a motion to estimate the claim of MMR et al. for all purposes. Pursuant to an agreement between the Trustee and MMR, the motion to estimate has been removed from the Bankruptcy Court schedule subject to either party asking the Bankruptcy Court to set the matter for hearing. The Trustee has filed an objection to the proof of claim filed by MMR. For the reasons stated in the Estimation Motion and the objection to MMR's Claim, the Trustee believes this Claim will not be allowed.

#### 2.     SCS Litigation

A lawsuit was originally brought by Stearns, Conrad and Schmidt Consulting Engineers, Inc. d/b/a SCS Engineers and d/b/a SCS Field Services against MMR, in the 19th Judicial District Court, Parish of East Baton Rouge, State of Louisiana in Cause No. 549125, to which the Debtors have been joined.

### 3.  ES Litigation

In its proof of claim, Bluff Power has asserted derivative claims against the Debtors' General Partner for breach of fiduciary duty, waste, mismanagement, breach of contract, fraud, gross negligence and willful misconduct.  Bluff Power believes these claims are worth between $6 million and $100 million.  Trustee believes that these claims will be property of the Trust and will be investigated by the Liquidating Trustee.  The Liquidating Trustee will have the sole right to pursue these claims or, subject to bankruptcy court approval to settle such claims.

### 4.  City Litigation

Bluff Power believes the City is in breach of the City Lease.  To the extent such claims are not settled as part of the City Cure Costs, or otherwise the claims will be property of the Trust and will be investigated by the Liquidating Trustee.  The Liquidating Trustee will have the sole right to pursue these claims or, subject to bankruptcy court approval to settle such claims.

### 5.  Potential Litigation Claims

The Trustee reserves all other Litigation Claims including, without comment on their validity, all claims asserted by Bluff Power in its proofs of claim; claims against the ES Group for, among other things, its failure to defease the Minority Bonds; claims against Bluff power; claims against SCS; claims against MMR and claims against the City of Dallas (unless released as part of the cure of the City Lease).

## VIII.  CONDITIONS PRECEDENT TO EFFECTIVE DATE OF THE PLAN

### A.  Conditions to Effectiveness of the Plan

The Effective Date of the Plan shall not occur unless and until the following conditions shall have been satisfied or waived in writing by the Trustee:  (i) the Bankruptcy Court shall have entered the Confirmation Order, in form and substance acceptable to the Trustee; and (ii) all actions, documents, and agreements necessary to implement the Plan shall have been effected or executed.

### B.  Deadline for Effectiveness of Plan

If all of the conditions to the effectiveness of the Plan, as set forth in Article VII.A. above, have not been satisfied or waived by December 31, 2007, the Plan shall be deemed terminated and the Confirmation Order shall be deemed vacated. The deadline for effectiveness of the Plan set forth herein can be extended, modified or waived only by the Trustee. On or prior to December 31, 2007, the Trustee shall file a notice with the Bankruptcy Court stating that all of the conditions to the effectiveness of the Plan, as set forth above, have either (i) been satisfied or waived and setting forth the Effective Date, or (ii) not been satisfied or waived and there is no Effective Date.

### C.  Modifications; Withdrawal

The Trustee reserves the right to modify the Plan either before or after confirmation to the fullest extent permitted under section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019. The Trustee may withdraw the Plan at any time before the Effective Date.

## IX. CERTAIN RISK FACTORS TO BE CONSIDERED

Parties in interest should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference herein), including those items discussed in the Projections attached hereto, before deciding whether to accept or reject the Plan.

If the Plan is not confirmed and consummated, there can be no assurance that the Chapter 11 Cases will continue rather than be converted to chapter 7 liquidations. The Trustee has no reason to believe that such a process would yield a return to creditors and Equity Interest holders higher than the Plan. It is possible that absent confirmation of the Plan, the result may be a lower purchase price for the Assets in a Chapter 7 liquidation proceeding, or alternatively, a piecemeal liquidation of estate assets. If that were to occur, holders of Claims or Equity Interests might see substantially lower recovery, or no recovery at all.

## X. ALTERNATIVES TO THE PLAN

In the event that Camco elects not to participate in the Auction, the Trustee will first seek to replace Camco as the lead bidder with one of the other interested bidders at a minimum price of $11,250,000. To the extent no other bidder is willing to serve as a lead bidder, the Trustee will set a floor price of the Debtors' assets at $11,250,000 and conduct a "naked" auction, where interested parties will be invited to bid, but no breakup fee should be awarded under those circumstances. In the event that no bidders participate in the "naked" auction, the Trustee will consider supporting the Bluff/MMR Plan if the Trustee believes such plan to be in the best interest of the Debtors' estates.

## XI. CONFIRMATION OF THE PLAN

The Bankruptcy Court may confirm the Plan only if it determines that the Plan complies with the technical requirements of Chapter 11, including, among other things, that (a) the Plan properly classifies Claims and Equity Interests (b) the Plan complies with applicable provisions of the Bankruptcy Code, (c) the Trustee has complied with applicable provisions of the Bankruptcy Code, (d) the Trustee has proposed the Plan in good faith and not by any means forbidden by law, (e) disclosure of "adequate information" as required by section 1125 of the Bankruptcy Code has been made, (f) the Plan has been accepted by the requisite votes of creditors or interest holders (except to the extent "cramdown" is available under section 1129(b) of the Bankruptcy Code), (g) the Plan is in the "best interests" of all holders of Claims and Equity Interests in each impaired Class, (h) all fees and expenses payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court and the Confirmation Hearing, have been paid, or the Plan provides for the payment of such fees on the Effective Date, and (i) the Plan provides for the payment of all retiree benefits, as defined in section 1114 of the Bankruptcy Code, at the level established at any time before confirmation in accordance with section 1114(e)(1)(B) or

1114(g) of the Bankruptcy Code, for the duration of the period that the Debtor has obligated itself to provide such benefits.

## A.    Voting Requirements

Under the Bankruptcy Code, only Classes of Claims and Equity Interests that are "impaired" are entitled to vote to accept or reject the Plan.   A Class is impaired if the Plan modifies the legal, equitable or contractual rights of holders of Claims or Equity Interests in the Class (other than by curing defaults and reinstating debt).   Under section 1126(f) of the Bankruptcy Code, Classes of Claims or Equity Interests that are unimpaired are conclusively presumed to have accepted the Plan and are not entitled to vote on the Plan.   Under section 1126(g) of the Bankruptcy Code, Classes of Claim and Equity Interests whose holders will not receive or retain any property under the Plan are deemed to have rejected the Plan and are not entitled to vote on the Plan.

An Impaired Class of Claims shall have accepted the Plan if (i) the holders of at least two-thirds in amount of the Allowed Claims actually voting in the Class have voted to accept the Plan and (ii) holders of more than one-half in number of the Allowed Claims voting in the Class have voted to accept the Plan, in each case not counting the vote of any holder designated under section 1126(e) of the Bankruptcy Code.

An Impaired Class of Equity Interests shall have accepted the Plan if the holders of at least two-thirds in amount of Allowed Equity Interests actually voting the Class have voted to accept the Plan, in each case not counting the vote of any holder designated under section 1126(e) of the Bankruptcy Code.

Classes 2A, 2B, 4A, 4B, 5A, 5B, 5C, 5D, 6A, 6B, 7A, 7B, 8A and 8B are Impaired under the Plan.   Accordingly the holders of Claims in Classes 2A, 2B, 4A, 4B, 5A, 5B, 5C, 5D, 6A, 6B, 7A, 7B and Equity Interests in Classes 8A and 8B are entitled to vote on the Plan.   The holders of Claims in Classes 1A, 1B, 3A and 3B are unimpaired and not entitled to vote on the Plan.

## B.    Feasibility of the Plan

In connection with confirmation of the Plan, section 1129(a)(11) of the Bankruptcy Code requires that the Bankruptcy Court find that consummation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor.   This is the so called "feasibility" test.   As demonstrated in Exhibit B, the Plan provides for the sale of substantially all of the Debtors' assets for $11,250,000, a sum the Trustee believes is sufficient to pay all Allowed Claims in full and provide a substantial payment to Allowed Equity Interest holders.   The Debtors will not be continuing to do business postconfiramtion.   As such confirmation of the Plan is very unlikely to be followed by further liquidation.   Accordingly, the Trustee believes that the Plan complies with the standard of section 1129(a)(11) of the Bankruptcy Code.

## C.    Best Interests Test

Even if the Plan is accepted by each Class of holders of Claims and Equity Interests, the Bankruptcy Code requires the Bankruptcy Court find the Plan is in the "best interests" of all holders of Claims or Equity Interests that are impaired by the Plan and that have not accepted the Plan. The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a bankruptcy court to find either that (i) all members of an impaired class have voted to accept a plan, or (ii) the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code on such date.

To calculate the probable distribution to members of each class of holders of claims or interests if a debtor were liquidated under Chapter 7, a Bankruptcy Court must first determine the aggregate dollar amount that would be generated from the debtor's assets if its Chapter 11 case were converted to a Chapter 7 case under the Bankruptcy Code. This "liquidation value" would consist primarily of the proceeds from a forced sale of the debtor's assets by a Chapter 7 trustee.

The amount of liquidation value available to unsecured creditors would be reduced by the claims of secured creditors to the extent of the value of their collateral and by the costs and expenses of liquidation, as well as by other administrative expenses of both the Chapter 7 case and the Chapter 11 case. Costs of a liquidation under Chapter 7 of the Bankruptcy Code would include the compensation of a Chapter 7 trustee, as well as counsel and other professionals retained by that trustee, asset disposition expenses, all unpaid expenses incurred by the debtors and Trustee in the Chapter 11 Cases (such as compensation of attorneys and advisors) that are allowed in the Chapter 7 case, litigation costs, and claims arising from the operations of the debtors during the pendency of the Cases. The liquidation would also likely prompt the rejection of executory contracts and unexpired leases and thereby create a significantly greater amount of unsecured claims.

Once the bankruptcy court ascertains the recoveries in liquidation of the secured creditors and priority claimants, it must determine the probable distribution to general unsecured creditors and equity interest holders from the remaining available proceeds in liquidation. If such probable distribution has a value greater than the distributions to be received by such creditors and equity interest holders under a debtor's plan, then such plan is not in the best interests of creditors and equity security holders.

In the event the Debtors' cases were converted, the Trustee does not believe there would be any funds available for distribution to creditors. Thus the Trustee believes that each member of each Class of Claims and Equity Interests will receive at least as much under the Plan as they would receive if the Debtors were liquidated in chapter 7 cases. More specifically, a liquidation of the Debtors would significantly impair recoveries to all stakeholders and clearly is not in the best interests of the estates' constituencies. Accordingly it is clear that stakeholders will fare much better under the Plan than in a liquidation. The Plan therefore satisfies the best interests test.


### D.    Confirmation Without Acceptance of All Impaired Classes – "Cramdown"

The Trustee may request confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code, and he reserves the right to modify the Plan to the extent, if any that confirmation in accordance with section 1129(b) of the Bankruptcy Code requires modification. Under section 1129(b) of the Bankruptcy Cod, the Court may confirm a plan over the objection of a rejecting class, if, among other things, (a) at least one impaired Class of Claims has accepted the plan (not counting votes of any "insiders" as defined in the Bankruptcy Code) and (b) if the plan "does not discriminate unfairly" against and is "fair and equitable" to each rejecting class.

A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a rejecting impaired class is treated equally with respect to other classes of equal rank. A plan is fair and equitable as to a class of secured claims that rejects the plan, if amount other things, the plan provides (a)(i) that the holders of claims in the rejecting class retain the liens securing those claims (whether the property subject to those liens is retained by the debtor or transferred to another entity) to the extent of the allowed amount of such claims and (ii) that each holder of a claim of such class receives on account of that claim deferred cash payments totaling at least the allowed amount of that claim, of a value, as of the effective date of the plan, of at least the value of the holder's interest in the estate's interests in such property; (b) for the sale, subject to section 363(k) of the Bankruptcy Code, of any property that is subject to liens securing the claims included in the rejecting class, free and clear of liens, with the liens to attach to the proceeds of the sale, and the treatment of the liens on proceeds under clause (a) or (c) of ht is paragraph, or (c) for the realization by such holders of the indubitable equivalent of such claims.

A plan is fair and equitable as to a class of unsecured claims that rejects the plan, if, among other things, the plan provides that (a) each holder of a claim in the rejecting class will receive or retain on account of its claim property that has a value, as of the effective date of the plan, equal to the allowed amount of the claim; or (b) no holder of a claim or interest that is junior to the claims of the rejecting class will receive or retain under the plan any property on account of such junior claim or interest.

A plan is fair and equitable as to a class of equity interests that rejects a plan in the plan provides, among other things that (a) each holder of an interest of such class receive or retain on account of such interest property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or (b) that no holder of an interest that is junior to such class will receive or retain under the plan any property on account of such junior interest.

## XII.  FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.      United States Federal Income Taxation

The following is a description of the material U.S. federal income tax consequences of the Plan to partners of the Debtors. This description only applies to partners who hold their partnership interests as capital assets and does not address, except as set forth below, aspects of U.S. federal income taxation that may be applicable to partners that are subject to special tax rules, such as financial institutions, insurance companies, real estate investment trusts, regulated

investment companies, grantor trusts, partners that have a functional currency other than the U.S. Dollar, tax exempt organizations, certain former citizens and long-term residents of the United States, partners that hold their interests through a partnership or other pass through entity, dealers or traders in securities or foreign currencies, or partners that hold their interests as part of a straddle, a hedging, conversion or other integrated transaction for U.S. federal income tax purposes.

Moreover, this description does not address the U.S. federal estate and gift tax or alternative minimum tax consequences of the acquisition, ownership, disposition or retirement of partnership interests and only addresses the U.S. federal income tax treatment of the Plan to partner. Each partner should consult its own tax advisor with respect to the U.S. federal, state, local and foreign tax consequences of acquiring, holding and disposing of interests in the Debtors.

This description is based on the U.S. Internal Revenue Code of 1986, as amended (the "Code"), existing and proposed U.S. Treasury Regulations, administrative pronouncements and judicial decisions, each as available on the date hereof. All of the foregoing is subject to change, possibly with retroactive effect, or differing interpretations, which could affect the tax consequences described herein.

For purposes of this description, a U.S. Holder is a beneficial owner of a partnership interest that, for U.S. federal income tax purposes, is: (i) a citizen or resident of the United States; (ii) a corporation (or an entity treated as a corporation for U.S. federal income tax purposes) organized in or under the laws of the United States or any State or political subdivision thereof, including the District of Columbia; (iii) an estate the income of which is subject to U.S. federal income taxation regardless of its source; or (iv) a trust (1) that validly elects to be treated as a United States person for U.S. federal income tax purposes or (2)(a) the administration over which a U.S. court can exercise primary supervision and (b) all of the substantial decisions of which one or more United States persons have the authority to control.

A Non-U.S. Holder is a beneficial owner of a partnership interest that is neither a U.S. Holder nor a partnership (or an entity treated as a partnership for U.S. federal income tax purposes). This description does not address the tax treatment of Non-U.S. Holders.

If a partnership (or an entity treated as a partnership for U.S. federal income tax purposes) holds a partnership interest, the tax treatment of the partnership and a partner in such partnership generally will depend on the status of the partner and the activities of the partnership. Such partner or partnership should consult its own tax advisor as to its consequences of acquiring, owning or disposing of the interests in the Debtors.

### B. U.S. Internal Revenue Service Circular 230 Disclosure

**Pursuant to U.S. Internal Revenue Service Circular 230, we hereby inform you that the description set forth herein with respect to U.S. federal tax issues was not intended or written to be used, and such description cannot be used, by any taxpayer for the purpose of avoiding any penalties that may be imposed on the taxpayer under the U.S. Internal Revenue Code. This description is limited to the U.S. federal tax issues described herein. It**

is possible that additional issues may exist that could affect the U.S. federal tax treatment of the Debtors or partners, or the matter that is the subject of the description noted herein, and this description does not consider or provide any conclusions with respect to any such additional issues. Partners should seek advice based on the partner's particular circumstances from an independent tax advisor.

### C.     Tax Consequences of Owning Partnership Interests

**Basis of Equity Interests.**  Generally, a partner's initial tax basis in a partnership interest will be the amount paid for the interest.  The initial tax basis will generally be increased by the amount of any additional cash contributions to a Debtor, the partner's share of Debtor income and by the increase in the partner's share of Debtor liabilities, if any.  The tax basis for an interest will generally be decreased (but not below zero) by distributions from a Debtor, including any decrease in the partner's share of Debtor liabilities, if any, and by the partner's share of Debtor losses and deductions.  A partner's share of liabilities, if any, will generally be based on such partner's share of Debtor profits.

**Flow-through of Taxable Income.**  No federal income tax will be paid by a Debtor. Instead, each partner will be required to report on the partner's income tax return the partner's allocable share of the income, gains, losses and deductions of a Debtor without regard to whether corresponding cash distributions are received by the partner.  Consequently, a partner may be allocated income from a Debtor even though the partner has not received a cash distribution in respect of such income.  Each partner will be required to include in income its allocable share of a Debtor's income, gain, loss and deduction for a Debtor's tax year ending with or within such partner's taxable year.

**Treatment of Debtor Distributions.**  Cash distributions by a Debtor to a partner generally will not be taxable to the partner for federal income tax purposes to the extent of such partner's tax basis in its Debtor equity interest immediately before the distribution.  Cash distributions in excess of such partner's tax basis generally will be considered to be gain from the sale or exchange of a Debtor equity interest.

Any reduction in a partner's share of Debtor liabilities for which no partner bears the economic risk of loss will be treated as a distribution of cash to the partner.  A decrease in a partner's percentage equity interest in a Debtor, because of the issuance by the Debtor of additional Debtor equity interests, or otherwise, will decrease a current partner's share of liabilities, if any, and thus will result in a corresponding deemed distribution of cash.  A non-pro rata distribution of money or property may result in ordinary income to a partner, regardless of its tax basis in its Debtor equity interest, if the distribution reduces the partner's share of Debtor "unrealized receivables," and/or substantially appreciated "inventory items," both as defined in the Code, and collectively, "Section 751 Assets."  To that extent, partners will be treated as having been distributed a proportionate share of the Section 751 Assets and having exchanged those assets in return for the non-pro rata portion of the actual distribution.  This latter deemed exchange will generally result in the partner's realization of ordinary income, which will equal the excess of (1) the non-pro rata portion of that distribution over (2) the partner's tax basis for the share of Section 751 Assets deemed relinquished in the exchange.

**Limitations on Deductibility of Debtor Losses**. To the extent losses are incurred by a Debtor, a partner's deductions for such partner's share of such losses will be limited to the tax basis of the partnership interest held by such holder or, in the case of an individual partner or a corporate partner if more than 50% in the value of its stock is owned directly or indirectly by five or fewer individuals or certain tax-exempt organizations, to the amount that the partner is considered to be "at risk" with respect to a Debtor's activities, if that amount is less than the holder's tax basis in such equity interest. A partner must recapture losses deducted in previous years to the extent that Debtor distributions cause the partners' at risk amount to be less than zero at the end of any taxable year. Losses disallowed to a partner or recaptured as a result of these limitations will carry forward and will be allowable to the extent that the partner's tax basis or at risk amount (whichever is the limiting factor) is increased. Upon the taxable disposition of an interest in a Debtor, any gain recognized by a partner can be offset by losses previously suspended by the "at risk" limitation, but may not be offset by losses suspended by the tax basis limitation. Any excess loss above the gain previously suspended by the at risk or tax basis limitation is no longer utilizable.

In general, a partner will be at risk to the extent of the amount of money contributed for its equity interest, but this may be less than the partner's tax basis for the interest in an amount equal to the partner's share of liabilities, if any. A partner's at risk amount will increase or decrease as the partner's tax basis increases or decreases, other than tax basis increases or decreases attributable to increases or decreases in its share of Debtor liabilities.

The passive loss rules generally provide that individuals, estates, trusts and certain closely-held corporations and personal service corporations can deduct passive losses only against income from passive activities (typically an activity in which the taxpayer does not materially participate) but not from investments, salaries or active business income. Ownership of Debtor equity interests may be a passive activity and a partner will be subject to the passive activity loss limitations with respect to his share of Debtor losses and deductions. Generally, passive losses that are not deductible, because they exceed the partner's allocable share of income generated by a Debtor and other passive activities would be deductible in the case of a fully taxable disposition of the partner's equity interests in a Debtor to an unrelated party. The passive activity loss rules are applied after other applicable limitations on deductions such as the at risk rules and the tax basis limitation.

**Sale of Debtor Property.** If a Debtor sells property pursuant to the Plan, it will recognize gain to the extent that the amount realized on the sale exceeds its basis in the property and will recognize loss to the extent that its tax basis exceeds the amount realized. The amount realized will include the amount of money received and the fair market value of any other property received. If the purchaser assumes a liability in connection with the sale or takes the property subject to a liability, the amount realized will include the amount of such liability.

If gain is recognized on such sale, the portion of the gain that is treated as recapture of depreciation deductions will be treated as ordinary income and the remainder generally will constitute "Section 1231 gain." If loss is recognized on such sale, such loss generally will constitute "Section 1231 loss."

Each partner will be required to report his share of the portion of the gain that constitutes recapture as ordinary income and must also take into account his share of the Section 1231 gains and losses along with his Section 1231 gains and losses from other sources. The characterization of the partner's share of the Section 1231 gains and Section 1231 losses attributable to Debtor properties as either ordinary or capital will depend on the total amount of the partner's Section 1231 gains and the total amount of his Section 1231 losses from all sources for the year. Generally, if the total amount of the gains exceeds the total amount of the losses, all such gains and losses will be treated as capital gains and losses, and if the total amount of the losses exceeds the total amount of the gains, all such gains and losses will be treated as ordinary income and losses. A partner's net Section 1231 gains, however, will be treated as ordinary income to the extent of the partner's net Section 1231 losses during the immediately preceding five years, reduced by the Section 1231 losses previously recaptured under this rule.

**Dissolution of a Debtor.** A partner will not ordinarily recognize gain on the termination of a Debtor and distribution of the assets to the partners. Should a partner receive cash in excess of the adjusted tax basis of his Debtor equity interest, however, taxable gain would result. Likewise, gain or loss and recapture of depreciation may also be realized when a partner sells property received in a distribution.

**Cancellation of Debt Income.** Generally, if a taxpayer discharges a debt for less than the amount owing, the taxpayer is required to recognize ordinary income in the amount discharged. Debt discharge income to a partnership is recognized as partnership income and flows through to the partners. The Plan contemplates that all creditors of the Debtor will be paid in full. Therefore, it is not anticipated that there will be any cancellation of debt income.

### D.     Other Tax Consequences

Alternative Minimum Tax. The individual alternative minimum tax is imposed at graduated rates of 26% and 28% on "alternative minimum taxable income" in excess of exemption amounts. The tax thus computed is reduced by the taxpayer's regular tax liability.

Alternative minimum taxable income is computed by increasing regular taxable income by tax preference items and recomputing certain items. For an individual taxpayer, adjustments include such items as the difference between accelerated depreciation deductions and depreciation deductions under the alternative system of Code Section 168(g).

The passive activity limitations also apply for purposes of computing alternative minimum taxable income, although tax preference items taken into account for purposes of the passive activity rules are not taken into account in computing alternative minimum taxable income.

Corporations are subject to an alternative minimum tax of 20% of alternative minimum taxable income to the extent that such amount exceeds the greater of (a) the corporation's federal income tax liability or (b) certain exemption amounts. Corporate items of tax preference include items similar to those described above for individuals, and a number of additional items.

Because a partner's liability for the alternative minimum tax is computed by taking into account his regular income tax liability, the extent to which any tax preference items directly or

indirectly resulting from an investment in interests would be subject to the alternative minimum tax will depend on the facts of his particular situation. For a taxpayer with substantial tax preference items, the alternative minimum tax could reduce the after-tax economic benefit of his investment in interests. Each potential partner should consult his tax advisor concerning the impact of the alternative minimum tax on his investment in interests.

### E. Other Taxes

In addition to federal income taxes, partners may be subject to other taxes, such as state, local and foreign taxes, unincorporated business taxes, and estate, inheritance or intangible taxes that may be imposed by the various jurisdictions in which a Debtor does business or owns property. A partner will likely be required to file state income tax returns and/or to pay such taxes in most of such states and may be subject to penalties for failure to file tax returns and/or to pay such taxes in most of such states and may be subject to penalties for failure to comply with such requirements. Some states may require that a Debtor withhold a percentage of income from amounts that are to be distributed to a partner that is not a resident of the state. Such amounts withheld, if any, which may be greater or less than a particular partner's income tax liability to the state, generally do not relieve the non-resident partner from the obligation to file a state income tax return. Amounts withheld, if any, will be treated as if distributed to partners for purposes of determining the amounts distributed by a Debtor.

It is the responsibility of each partner to investigate the legal and tax consequences, under the laws of pertinent states or localities, of its investment in a Debtor. Further, it is the responsibility of each partner to file all state and local, as well as federal tax returns that may be required of such partner. The Debtors have received no legal opinion on the federal, state or local tax consequences of an investment in a Debtor.

## XIII. RECOMMENDATIONS AND CONCLUSION

THE TRUSTEE BELIEVES THAT THE PLAN'S CONFIRMATION IS IN THE BEST INTERESTS OF THE DEBTORS, THEIR ESTATES AND CREDITORS. FOR THESE REASONS THE TRUSTEE URGES ALL CREDITORS AND INTEREST HOLDERS TO VOTE TO ACCEPT THE PLAN AND TO EVIDENCE THEIR ACCEPTANCE BY DULY COMPLETING AND RETURNING THEIR BALLOTS SO THAT THEY WILL BE RECEIVED BY THE BALLOTING AGENT (AS DEFINED ABOVE) ON OR BEFORE NOVEMBER 13, 2007, AT 4:00 P.M. CENTRAL STANDARD TIME.

**McCommas Landfill Partners, LP**

By: _/s/ William Snyder_____
      William Snyder, Chapter 11 Trustee

**McCommas LFG Processing Partners, LP**

By: ___/s/ William Snyder_____
      William Snyder, Chapter 11 Trustee

BRACEWELL & GIULIANI LLP

Samuel M. Stricklin
State Bar No. 19397050
John C. Leininger
State Bar No. 24007544
1445 Ross Ave., Suite 3800
Dallas, Texas 75202

(214) 758-1000 (Telephone)
(214) 758-8343 (Facsimile)

ATTORNEYS FOR CHAPTER 11 TRUSTEE